1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6                                  EUREKA DIVISION

7

8    MARCELL LAMONT BRANCH,                    Case No.  19-cv-02996-RMI

9              Plaintiff,
                                               **ORDER ON CROSS MOTIONS FOR**
10         v.                                  **SUMMARY JUDGMENT**

11   NANCY A. BERRYHILL,                        Re: Dkt. Nos. 14, 18

12             Defendant.

13

14         Plaintiff, Marcell Lamont Branch, seeks judicial review of an administrative law judge

15   ("ALJ") decision denying his application for supplemental security income under Title XVI of the

16   Social Security Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied

17   by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of

18   Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties

19   have consented to the jurisdiction of a magistrate judge (dkts. 9 & 10), and both parties have

20   moved for summary judgment (dkts. 14 & 18). For the reasons stated below, the court will grant

21   Plaintiff's motion for summary judgment, and will deny Defendant's motion for summary

22   judgment.

23                                    **LEGAL STANDARDS**

24         The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be

25   conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set

26   aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal

27   error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase

28   "substantial evidence" appears throughout administrative law and directs courts in their review of

United States District Court
Northern District of California

factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

**PROCEDURAL HISTORY**

In September of 2015, Plaintiff filed an application for supplemental security income, alleging an onset date of July 1, 2001. *See* Administrative Record "*AR*" at 27.[1] As set forth in detail below, the ALJ rendered a partially favorable decision and found Plaintiff to be disabled, due to his age, after November 1, 2017, however, as to the period between the alleged onset date and November of 2017, the ALJ denied the application on March 30, 2018. *Id*. at 34-36. The Appeals Council denied Plaintiff's request for review on March 28, 2019. *See id*. at 1-4.

**SUMMARY OF THE RELEVANT EVIDENCE**

With the exception of a few brief stints of incarceration or psychiatric hospitalization, the majority of Plaintiff's adult life has been spent in homelessness. *See id*. at 316, 325, 581, 589, 1072-73. Various treating and examining physicians have diagnosed Plaintiff with severe depression, posttraumatic stress disorder ("PTSD"), bipolar disorder, intellectual functioning in the extremely low range, major depressive disorder, intellectual disability, a personality disorder, a herniated disc in his lumbar spine, two dislocated shoulders stemming from being beaten with a baseball bat, hypertension, arthritis, a gunshot wound, gout, and bursitis. *See id*. at 581, 584, 591, 593, 594, 682, 1076.

---

[1] The *AR*, which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #13. *See* (dkts. 13-1 through 13-24).

*Plaintiff's Background*

As a young child, Plaintiff suffered from a learning disability and was placed in special education classes for the entirety of his course of education which ended with high school. *Id*. at 588, 1077. From an early age – at least dating back to his teenage years – Plaintiff has steadily experienced auditory hallucinations wherein he would hear voices in his head telling him to kill, rob, or hurt people. *Id*. at 590. During those years, he found that using cocaine tended to mute the voices and abate the auditory hallucinations. *Id*. at 1077. Thereafter, in addition to contending with the symptoms of his various mental impairments, he also struggled with the newfound addiction to cocaine. *Id*. at 588, 589, 1073, 1077. In 2013, he eventually succeeded in his campaign to overcome his addiction after two psychiatric hospitalizations and two intensive drug treatment programs. *Id*. 589, 1073. While he has maintained sobriety since 2013, his auditory hallucinations have continued in that Plaintiff hears voices in his head that use profanity while persistently telling him to "get out of the way." *Id*. at 1074. During various periods of either incarceration or hospitalization, or when he has otherwise had access to medication for his bipolar disorder (such as Depakote, Abilify, and Trazadone), it has been easier for Plaintiff to tune out or ignore the auditory hallucinations. *Id*. at 582, 590, 594. However, during other periods of his life – such as during times when he is experiencing homelessness and does not have access to medication – Plaintiff continues to hear voices in his head that tell him to kill or hurt people; fortunately, he has always been able to ignore the impulse to act in conformity with the horrifying directives at the heart of his auditory hallucinations. *Id*. at 594.

After high school, Plaintiff participated in a youth program through which he was able to find work in the landscaping field for a short period of time. *Id*. In his early 20s, he was involved in a serious automobile accident during which he suffered spinal injuries – due to those injuries, as well as his mental health symptoms, Plaintiff received disability assistance throughout his 20s while he lived his mother. *Id*. at 588. In his late 20s, his mental health took a turn for the worse when he experienced the trauma of being the one to discover his mother's body upon her untimely death due to cancer, as a result of which Plaintiff underwent a number of psychiatric hospitalizations due to trauma symptoms and suicidal ideations. *Id*. at 582, 588, 1073. Following

United States District Court
Northern District of California

1    the passing of his mother, and the deepening of his psychiatric symptoms, Plaintiff was unable to

2    support himself and became homeless. *Id*. at 1072. Some years later, in 2000, he managed to

3    secure employment with a waste management company; however, his employment was quickly

4    terminated due to erratic driving of the company truck. *Id*. at 588. Thereafter, following more

5    years spent in homelessness, Plaintiff spent nearly two years in prison between 2008 and 2010 for

6    a theft offense. *Id*. at 589. Following his release in 2010, he quickly decompensated and the rapid

7    worsening of his symptoms caused him to undergo yet another psychiatric hospitalization. *Id*.

8    ***Medical Evidence***

9         The record reflects a series of medical opinions rendered by Dr. Jeffrey Seal, Plaintiff's

10   treating psychotherapist, who was assisted by Kari Jennings-Parriott, a social worker (*id*. at 682-

11   86, 1090-1165), by Laura Jean Catlin, a licensed psychologist who examined and evaluated

12   Plaintiff on two occasions (*id*. at 587-96, 1071-89), by Dr. Huen, an internal medicine physician

13   who examined Plaintiff in early 2016 (*id*. at 581-85), as well as the opinions of four non-

14   examining consultants retained by the state disability evaluation agency (*id*. at 118-32, 134-52).

15   *Non-Examining Consultants*

16        In early 2016, upon initial consideration of Plaintiff's disability application, while the

17   examiner and adjudicator of the application opined that consultative examinations were necessary

18   because "[t]he evidence was a whole, both medical and non-medical, [was] not sufficient to

19   support a decision on the claim," Plaintiff was nevertheless found not disabled and it was opined

20   by Drs. Bilik and Samplay that Plaintiff could perform light work with a few modest exertional

21   limitations and no communicative or environmental limitations. *See id*. at 123-24, 128, 130, 132.

22   At the reconsideration level of review in May of 2016, Plaintiff was again found not to be disabled

23   while the examiner and adjudicator of his application once again noted that a consultative

24   examination was necessary because the evidence was insufficient to support a decision on the

25   application. *See id*. at 134, 140, 151-52. This time, however, after opining a similar functional

26   capacity consisting of light work with a similar set of modest limitations, Drs. Econome and

27   Pancho opined that Plaintiff also experienced "moderate limitations" in various areas of

28   understanding and memory, in his ability to concentrate and maintain persistence, in his ability to

4

1    interact with others, and in his ability to adapt and respond appropriately to changes in the work

2    setting. *Id.* at 140, 142-43, 146-49.

3    *Plaintiff's Treating Physician*

4           Plaintiff underwent a lengthy course of mental health treatment by a variety of clinicians at

5    the Lifelong Trust Health Center in Oakland, California, all of whom worked under the

6    supervision and direction of Jeffrey Seal, M.D., Plaintiff's psychiatrist who also served as the

7    health center's medical director. *See id.* at 682-86, *see also id.* at 1090-1165. Between October of

8    2016, and late November of 2017, Plaintiff received mental health treatment and psychotherapy

9    sessions on a regular basis from his clinicians at Lifelong Trust, totaling no less than 24 sessions.

10   *See id.* at 1090-1165. On November 27, 2017, Dr. Seal and Social Worker Kari Jennings-Parriott,

11   jointly subscribed to a medical source statement wherein Dr. Seal rendered a series of opinions

12   regarding Plaintiff's mental health condition and its associated limitations. *Id.* at 682-86. In

13   arriving at these conclusions, Dr. Seal reviewed Plaintiff's entire medical file, including the

14   progress notes from each of the above-described psychotherapy sessions, as well as reviewing the

15   psychological evaluations performed by Dr. Catlin. *Id.* at 682. Dr. Seal began by noting that

16   Plaintiff's response to treatment has been poor as the symptoms related to his PTSD and major

17   depressive disorder continue to interfere with his ability to trust others enough to open up about

18   his experiences and feelings, as well as the fact that he continues to experience difficulties with

19   memory and organization. *Id.* Adding that Plaintiff's depression and PTSD magnify his physical

20   pain and reduce his coping skills, Dr. Seal opined that Plaintiff's mental health impairments

21   actually operate to exacerbate the symptoms associated with his physical impairments. *Id.* Dr. Seal

22   then proceeded to enumerate the staggering list of symptoms associated with Plaintiff's mental

23   impairments as including the following: significant deficits in complex attention, executive

24   function, learning, memory, language, perceptual-motor function, and social cognition; significant

25   difficulties in learning and using academic skills; disorganized thinking; grossly disorganized

26   behavior manifesting as catatonia; diminished interest in almost all activities; sleep disturbance;

27   depressed mood; disturbances in mood and behavior; feelings of guilt and worthlessness; feelings

28   of inadequacy; thoughts of death and suicide; easily fatigued; decreased energy; difficulty in

United States District Court
Northern District of California

5

1   concentrating, thinking, or organizing tasks; frequent distractibility; difficulty in sustaining

2   attention; restlessness; irritability; involvement in activities that have high probabilities of

3   unrecognized painful consequences; involuntary and time-consuming preoccupation with intrusive

4   and unwanted thoughts; increases in emotional arousal and reactivity; behavioral outbursts that are

5   recurrent, impulsive, and aggressive; exposure to actual or threatened death, serious injury, or

6   violence; avoidance of external reminders of the event in which his trauma is rooted; involuntary

7   re-experiencing of a traumatic event; and, distrust or suspicion of others. *Id*. at 683-84.

8       Then, given the fact that Plaintiff's substance abuse history had gone into remission quite a

9   few years earlier, Dr. Seal noted that Plaintiff did not have a substance use disorder. *Id*. at 685. In

10   opining as to the resulting limitations associated with Plaintiff's symptoms, Dr. Seal defined a

11   "moderate limitation" as one that would preclude his performance in a given area of function by

12   20% in an 8-hour workday, and a "marked limitation" as one that would be expected to preclude

13   functioning in that area by more than 20% of an 8-hour workday. *Id*. at 684. Accordingly, Dr. Seal

14   found that Plaintiff suffered marked limitations in the following domains of functioning: in his

15   ability to understand, remember, and apply information (i.e., the ability to learn, recall, use

16   information independently, effectively, appropriately, and on a sustained basis); in his ability to

17   interact with others (i.e., to relate to and work with supervisors, coworkers, and the public

18   independently, appropriately, effectively, and on a sustained basis); in his ability to concentrate,

19   persist, and maintain pace (i.e., to focus attention on activities and stay on-task at a sustained rate

20   independently, appropriately, effectively, and on a sustained basis); and, in his ability to adapt or

21   manage himself (i.e., to regulate emotions, control behavior, and maintain wellbeing

22   independently, appropriately, effectively, and on a sustained basis). *Id*. at 684-85. Furthermore,

23   Dr. Seal opined that, due to his symptoms and his need for treatment, Plaintiff should be expected

24   to be absent from work "4 days or more" in any given month, while being off-task "more than

25   30%" of any given workday. *Id*. at 685. In fact, Dr. Seal noted that the complexity and interaction

26   of Plaintiff's symptoms make it difficult for him to follow through with appointments, to regularly

27   take his medications, and, thus, to properly engage in treatment. *Id*. at 686. Further, while

28   Plaintiff's symptoms can be expected to fluctuate to some degree over time, Dr. Seal maintained

United States District Court
Northern District of California

6

United States District Court
Northern District of California

1   that despite the expectation of such fluctuation, his symptoms will remain "severe and persistent."

2   *Id*. Lastly, even though the depressive and trauma-related disorders have lasted for more than two

3   years, and despite the fact that medical treatment and psychotherapy diminish the signs and

4   symptoms his disorders, Dr. Seal noted that Plaintiff nevertheless shows marginal adjustment, that

5   is, he still suffers a minimal capacity to adapt to changes in his environment. *Id*.

6   *Internal Medicine Consultative Examination*

7            In early February of 2016, Plaint underwent a physical examination by Dr. Huen, a board

8   certified specialist in internal medicine. *Id*. at 581-85. Dr. Huen began by reciting Plaintiff's

9   medical history as including a gunshot wound in one leg, a herniated disc in his lower back, the

10  dislocation of both shoulders, arm and elbow surgery in 2015, arthritis, bursitis, and gout. *Id*. at

11  581. Dr. Huen then enumerated the symptoms as including left-arm numbness since being beaten

12  with a bat in 2012 or 2013, persistent leg and back pain since the herniation injury to his lumbar

13  spine resulting from the automobile accident, and difficulty sleeping due to pain from his arm,

14  back, and legs. *Id*. at 583. As to the physical examination, Dr. Huen noted that Plaintiff's ability to

15  bend and rotate at the cervical and lumbar spine were attended with substantial limitations in

16  various directions with movement being limited from 5 degrees to 20 degrees in certain directions.

17  *Id*. at 584. The upshot of these limitations in flexion and rotation led Dr. Huen to conclude that it

18  was difficult for Plaintiff to stand upright due to "curvature in his back," and that Plaintiff

19  ambulates slowly due to pain while limping bilaterally. *Id*. In short, Dr. Huen's impression was

20  that due to his spinal abnormalities, Plaintiff experiences significant lower back pain, and that

21  while the swelling in his ankles is consistent with gout, it is also possible that the "[g]unshot

22  wound to the left leg, [the] gout, and [the] bursitis are all part of the same package." *Id*. Due to

23  these physical conditions, Dr. Huen opined that Plaintiff can never climb, balance, stoop, kneel,

24  crouch, or crawl; that he must avoid hazards that might require him to move quickly as that would

25  not be possible; and that lifting and carrying "are pretty much ruled out currently because of back

26  pain." *Id*. Thus, Dr. Huen found that Plaintiff's work capacity "at this point is less than sedentary

27  given his inability to sit very long due to lumbar spine pain . . . [and that] his inability to sit would

28  be problematic for employment." *Id*. Finally, he noted that Plaintiff's spinal issues are in need of

1    further assessment and treatment because "his poor posture certainly leads him to be unsafe when

2    he is ambulating. He probably needs a cane." *Id*. at 585.

3    *Psychological Consultative Examinations*

4          In February of 2016, and again in March of 2017, Plaintiff underwent two separate

5    consultative psychological examinations by Laura Jean Catlin, Psy.D., at the Eastmont Self-

6    Sufficiency Center. *See id*. at 587-95, 1071-89. At the conclusion of the first evaluation, in

7    addition to finding that Plaintiff suffered extreme limitations in most functional categories, that he

8    manifested symptoms of severe depression, and that his test results placed him in the borderline

9    range with regards to neurocognitive deficits, Dr. Catlin also diagnosed Plaintiff with intellectual

10   disability, bipolar disorder, and PTSD. *Id*. at 593-94, 596, 1075-76. In the course of that

11   evaluation, Dr. Catlin conducted a clinical interview, performed a mental status exam, and

12   administered the following six diagnostic instruments: the Wechsler Abbreviated Scale of

13   Intelligence ("WASI"); the Repeatable Battery for the Assessment of Neuropsychological Status

14   ("RBANS"); the Beck Depression Inventory ("BDI"); the Burns PTSD Inventory; the Burns

15   Mania Scale; and, parts A and B of the trail-making tests. *Id*. at 587. Through the mental status

16   examination, Dr. Catlin immediately observed, likely as a result of many years of homelessness,

17   combined with his persistent physical pain and the manic and depressive swings caused by his

18   bipolar disorder, that Plaintiff "has great difficulty performing all activities of daily living," and

19   while he was adequately groomed and appropriately dressed, he was missing a number of teeth. *Id*.

20   at 588, 590. She also observed Plaintiff to have a flat affect combined with a depressed and

21   anxious mood. *Id*. at 590. She found that since his teenage years Plaintiff has been plagued by

22   auditory hallucinations which tell him to hurt or kill people, particularly when he is in a depressive

23   episode. *Id*. When Dr. Catlin inquired about suicidal ideations, Plaintiff reported that he would

24   like to end his life if he gets the chance which, unsurprisingly, caused Dr. Catlin to conclude that

25   Plaintiff's "thought content evidenced some perseveration on negative thinking." *Id*. Finding his

26   judgment and insight to be limited, his immediate and delayed memory to be impaired, and his

27   concentration to be poor, Dr. Catlin also noted "that he has great difficulty falling and staying

28   asleep." *Id*.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Dr. Catlin then proceeded to discuss Plaintiff's cognitive functioning by first addressing

2 his performance on the WASI, which is essentially an abbreviated IQ test consisting of four

3 subtests that measure a person's ability with regards to vocabulary, similarities, block design, and

4 matrix reasoning. *Id*. at 590-91. Plaintiff's verbal scores in the subtests assessing vocabulary and

5 similarities were in the extremely low range, and convert to an overall IQ score of 60, placing him

6 in the bottom 0.4% of the population; likewise, his scores on the block design and matrix

7 reasoning subtests were in the borderline to extremely low range, converting to an overall IQ score

8 of 67, placing him in the bottom 1% of the population. *Id*. at 591. Combined, his performance on

9 the WASI converted to an overall IQ score of 50, which indicated that Plaintiff operates in the

10 extremely low range of intellectual functioning, or, as Dr. Catlin put it, "[t]his placed him in the

11 0%." *Id*. Plaintiff's scores on the RBANS (which measures immediate and delayed memory,

12 attention, language, and visuospatial skills) were also in the extremely low range, with the

13 following subtest scores: his attention and delayed memory were in the extremely low range; his

14 language and visuospatial abilities were in the severely impaired range; and, his immediate

15 memory was in the borderline range. *Id*. at 591-93. Regarding the two parts of the trail-making

16 tests, because Plaintiff was unable to understand the instructions for Trail A, the second part of the

17 test was not even administered. *Id.* at 593.

18    As to depression and reaction to trauma, Plaintiff's performance on the Burns PTSD

19 Inventory, the BDI, and the Burns Mania Scale indicated "symptoms of severe depression," as

20 well as a "profile [that] indicates he is experiencing many symptoms of PTSD [because] [f]inding

21 his mother deceased in their home left him feeling intensely afraid, helpless, and horrified [and]

22 [h]e has persistent memories of the event and become[s] very upset when thinking about the

23 event." *Id*. Dr. Caitlin described Plaintiff's "painful memories of the death of his mother" as

24 "unremitting." *Id*. at 594. Further, the Burns PTSD Inventory also indicated that Plaintiff's

25 reaction to this trauma has caused him to avoid people or places that remind him of his mother or

26 her death, to feel isolated and alienated from others, and that the trauma has contributed to his

27 difficulties with angry outbursts, concentration, and lack of sleep. *Id*. at 593. The Burns Mania test

28 yielded a profile wherein Plaintiff is characterized as an extremely irritable person with racing

thoughts, and prone to distractibility and impulsive activities. *Id*.

Evidencing his "serious cognitive impairments" and his extremely low scores on the intelligence tests, Dr. Catlin noted that Plaintiff was unable to even attempt either of the trail-making tests due to his inability to understand the instructions. *Id*. at 594. She further explained that his cognitive impairments affect his ability to remember, plan, and execute his activities of daily living, and that his emotional vulnerability compounds the effects of his cognitive impairments, which means that "[h]e tends to decompensate easily and has an increase in depressive or manic symptoms when there is a change in environment or when emotional stress is increased." *Id*. at 594-95. In this regard, Dr. Catlin added that Plaintiff's numerous limitations have seen to it that he has never been able to live independently, that he has only managed to undertake very limited employment, that he has been unsuccessful in school, and that he has struggled to manage his mental health symptoms – nevertheless, she opined that "[t]here is no evidence that the claimant's substance abuse in the past is the cause of his mental health disorders." *Id*. at 595. By way of a functional assessment, she found that Plaintiff was severely impaired in nearly every category of work-related functioning. *Id*. at 595-96. In addition to finding that Plaintiff has experienced multiple episodes of decompensation per year, with each one lasting at least two weeks, Dr. Catlin opined that Plaintiff's limitations were in the extreme range with respect to the activities of daily living, social functioning, and concentration, persistence, and pace. *Id*. at 596. Noting that Plaintiff is not malingering, and that his conditions are chronic and should be expected to last at least a year or longer, Dr. Catlin added that because of the above-described symptoms and their limiting effects, Plaintiff should be expected to be absent from work for more than 4 days per month, and that he "is unable to engage in any meaningful employment and would not be able to obtain or retain a job." *Id*. at 596; *see also id*. at 1080.

In the course of her second examination and evaluation in March of 2017, Dr. Catlin administered the unabbreviated Wechsler Adult Intelligence Scale – Fourth Edition ("WAIS-IV"), as well as another clinical interview, mental status examination, and a re-administering of the BDI and RBANS. *Id*. at 1071, 1074, 1083-89. Following the mental status exam, Dr. Catlin noted that Plaintiff continued to be burdened with suicidal thoughts and auditory hallucinations that tell him

to get out of the way; additionally, he continued to experience a loss of appetite and sleeplessness. *Id*. at 1073-74. Plaintiff's performance on the RBANS indicated again that he operated in the borderline range, but that his visual and spatial abilities were severely impaired. *Id*. at 1075-76. The BDI once again revealed symptoms of severe depression. *Id*. Upon administering the WAIS-IV, Dr. Catlin measured Plaintiff's full scale IQ score at 67, meaning that his overall thinking and reasoning abilities were in the extremely low range, or, at the bottom 1% of all individuals his age. *Id*. at 1077, 1084-86. The combination of his low IQ score and his many deficits in adaptive functioning in the conceptual, social, and practical domains led Dr. Catlin to conclude that Plaintiff suffers from an intellectual disability. *Id*. at 1077-78. Plaintiff's cognitive limitations cause him to have difficulties with reasoning, problem solving, planning, abstract thinking, judgment, academic learning, learning from experience, as well as understanding and following directions. *Id*. at 1078. His adaptive deficits limit his ability to function in areas such as communication, social participation, and independent living. *Id*. Indeed, as Dr. Catlin previously opined, these limitations have prevented Plaintiff from ever being able to live independently, or to successfully undertake employment, or to successfully participate in schooling without the need for special education services, or to manage his need for treatment or the effects of his symptoms. *Id*. at 595. In the conceptual domain, Plaintiff experiences difficulties with activities that require reading, writing, arithmetic, time management, and money management. *Id*. at 1078. In the social domain, Plaintiff's abilities show a lack of maturity in that he experiences difficulty regulating his emotions and his behavior while demonstrating a limited understanding of risk in social situations. *Id*. In the practical domain he requires assistance with daily living tasks such as shopping, food preparation, transportation, and money management. *Id*. The upshot of all this, in Dr. Catlin's opinion, is that Plaintiff's cognitive and adaptive deficits combine to produce a high risk of him being manipulated by others; further, his anxiety, depression, and paranoia make it very difficult for him to interact with others to any extent. *Id*. In the end, Dr. Catlin set forth twenty-four categories of work-related functional domains, and other than the ability to maintain basic standards of cleanliness (in which she found Plaintiff's to be mildly impaired), she found Plaintiff to suffer from marked impairments or extreme impairments in all of the other 23 categories. *Id*. at

11

1    1079-80.

2    ***Hearing Testimony***

3            In January of 2018, the matter came on for a hearing before the ALJ. *See id*. at 42-71. In

4    pertinent part, the vocational expert ("VE") testified that if a person were to be consistently off-

5    task for 10% of the time, there would be no jobs available for that person. *Id*. at 68-69. Further, the

6    VE testified that if a person were to be consistently absent from work for as little a one day per

7    month, month after month, such an individual would not be able to sustain employment. *Id*. at 69-

8    70. Lastly, the VE added that if a person were to leave work early, or arrive late, by an hour on a

9    regular basis – even only once a month – such a person would not be able to maintain

10   employment. *Id*. at 70.

11           **THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

12           A person filing a claim for social security disability benefits ("the claimant") must show

13   that he has the "inability to do any substantial gainful activity by reason of any medically

14   determinable physical or mental impairment" which has lasted or is expected to last for twelve or

15   more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909. The ALJ must consider all evidence in

16   the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-

17   step sequential evaluation process to determine whether the claimant is disabled (*see id*. §

18   416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that

19   the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

20           Here, the ALJ set forth the applicable law under the required five-step sequential

21   evaluation process. *AR* at 28-30. At Step One, the claimant bears the burden of showing he has not

22   been engaged in "substantial gainful activity" since the alleged date on which the claimant became

23   disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be

24   substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that

25   Plaintiff had not engaged in substantial gainful activity since the alleged onset date. *AR* at 30. At

26   Step Two, the claimant bears the burden of showing that he has a medically severe impairment or

27   combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe

28   if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than

United States District Court
Northern District of California

12

a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). The ALJ found that Plaintiff suffered from the following severe impairments: degenerative disc disease of the lumbar spine, diabetes, and gout. *AR* at 30. As to Plaintiff's bilateral shoulder dislocation, the gunshot wound in his left leg, and the bevy of mental impairments, the ALJ found them all to be non-severe. *Id*. at 30-31.

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the burden of showing his impairments meet or equal an impairment in the listing. *Id*. If the claimant is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four. *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments. *AR* at 31-32. Next, the ALJ determined that Plaintiff retained the RFC to perform work at the light exertional level but involving a series of modest postural limitations including finding, in pertinent part, that Plaintiff can lift and carry 20 pounds occasionally, that he can lift 10 pounds frequently, that he can sit, stand, or walk for up to 6 hours each day; that he can push or pull as much as he can lift and carry; and, that he can occasionally climb ramps, stairs, ladders, ropes, or scaffolds, as well as being able to occasionally balance, stoop, kneel, crouch, and crawl. *Id*. at 32-34.

At Step Four, the ALJ determined that Plaintiff is unable to perform his past relevant work because he has no past relevant work. *Id*. at 34. Lastly, at Step Five, the ALJ concluded, based on the RFC, Plaintiff's age, education, and the VE's testimony, that there are jobs that exist in significant numbers which Plaintiff could have performed – namely, the ALJ found that Plaintiff could have performed the functions of a fast food worker, a housekeeping cleaner, or a food service worker. *Id*. at 34-35. The ALJ then concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, during the period ranging from the alleged onset date of July 1, 2001, through November 1, 2017, the date on which Plaintiff's age category changed such as to compel a disability finding thereafter based on a direct application of Medical-Vocational Rule

United States District Court
Northern District of California

1    202.04.[2] *Id*. at 34-36. Thus, while the ALJ found Plaintiff to be disabled for the period of time

2    following November 1, 2017, Plaintiff was found not to be disabled for the 16 years and 4 months

3    between his alleged onset date of July 1, 2001, and November 1, 2017. *Id*. at 35.

### DISCUSSION

5    Plaintiff seeks review of the ALJ's partially favorable decision, presenting three assertions

6    of error and contending that the case is due to be remanded for the following reasons: (1) the ALJ

7    erred in evaluating the medical evidence by rejecting the opinions of Plaintiff's treating and

8    examining providers in favor of the opinions of non-examining sources; (2) the ALJ erred in

9    rejecting Plaintiff's pain and symptom testimony without providing clear and convincing reasons;

10   and, (3) the ALJ's above-described errors resulted in the formulation of an erroneous RFC that

11   was not based on substantial evidence. *See* Pl.'s Mot. (dkt. 14) at 8-17. Additionally, Plaintiff

12   contends that the court should reverse the Commissioner's determination and remand the case for

13   an immediate award of benefits because the record leaves no room for any serious doubt that

14   Plaintiff was, in fact, disabled between the alleged onset date of July 1, 2001, and the date in

15   November of 2017 when he became a person "of advanced age" under the Grids. *Id*. at 17-18. In

16   response, Defendant's arguments in this court venture to somewhat expand the ALJ's reasoning

17   through a series of *post hoc* rationalizations that are no more persuasive than the explanations

18   given by the ALJ for the weight given to the various sources of medical opinion evidence and for

19   the formulation of the RFC as it pertains to Plaintiff's mental impairments. *See* Def.'s Mot. (dkt.

20   18) at 15-18. However, because "[l]ong-standing principles of administrative law require [this

21   court] to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ

22   – not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking,"

23   the court will focus on the ALJ's explanations for his findings rather than the more expansive set

24   of explanations offered by Defendant in this court. *Bray v. Comm'r of SSA,* 554 F.3d 1219, 1225

25   (9th Cir. 2009) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[I]n dealing with a

---

[2] Once Plaintiff turned 55 in November of 2017, he became a person "of advanced age" (*see* 20 C.F.R. Part 404, Subpt. P, App. 2 § 201.00(f)), and, under the SSA's Medical-Vocational Guidelines (also known as the "Grids") Rule 202.04, a disability finding was compelled by virtue of his status as a person of advanced age with only a high school education and either unskilled work experience or no work experience at all.

1    determination or judgment which an administrative agency alone is authorized to make, [courts]

2    must judge the propriety of such action solely by the grounds invoked by the agency. If those

3    grounds are inadequate or improper, the court is powerless to affirm the administrative action by

4    substituting what it considers to be a more adequate or proper basis."); *see also Snell v. Apfel*, 177

5    F.3d 128, 134 (2d Cir. 1999) (The requirement that administrative tribunals must explain their

6    decisions "exists, in part, to let claimants understand the disposition of their cases.").

7        The ALJ's weighing of the various opinions in this case is puzzling. Regarding Plaintiff's

8    physical impairments, the only opinion from an examining or treating source was that of Dr.

9    Huen, which the ALJ rejected with hardly any explanation at all. *See AR* at 33-34. Specifically, the

10   ALJ decided to give Dr. Huen's opinions "little weight" based on a two-sentence explanation: (1)

11   the ALJ maintained that some or all of Dr. Huen's opinions were "inconsistent with overall

12   medical evidence of record that included relatively normal physical findings except for some

13   occasional tenderness and edema and mild-moderate diagnostic findings," and (2) the ALJ found it

14   noteworthy that the state agency's non-examining consultants opined that Plaintiff was capable of

15   performing work at the light exertional level. *Id*. In fact, on the same page of the ALJ's decision,

16   his description of the evidentiary record seriously undermines his evaluation of Dr. Huen's

17   opinions. *See id*. at 33. Specifically, the ALJ noted that the record indicated that Plaintiff had a

18   long history of pain in his lumbar spine and gout affecting his ankles and feet, and that "[d]espite

19   normal physical examinations, the record indicates that the claimant's back condition along with

20   his gout continued to cause problems" through 2015 and into 2016, with evidence of pain in the

21   joints and muscles in his lower back, degeneration of the lumbosacral intervertebral disc in his

22   lumbar spine, gout, swelling in one ankle, soft tissue deficiency and the accumulation of fluid in

23   the right foot, as well as arthritis. *Id*. However, in the middle of this recitation, the ALJ curiously

24   noted that while using oxycodone helped Plaintiff to remain functional, Plaintiff was no longer

25   prescribed any narcotic pain medications, including oxycodone, beginning in 2016, due to his past

26   history of substance abuse leading up to 2013. *Id*. Thus, while failing to set forth or describe the

27   relevant findings and limitations opinions, the ALJ's justification for rejecting the entirety of Dr.

28   Huen's opinions relied, in part, on what can only be described as self-defeating reasoning. That is,

United States District Court
Northern District of California

15

1    an examining physician's opinion was given little weight because it was supposedly inconsistent

2    with a record that was then described as being substantially consistent, and then, adding that

3    although it was no longer available, oxycodone used to make Plaintiff feel better. *Id*. The second

4    basis provided by the ALJ for rejecting Dr. Huen's opinion was the fact that the ALJ had already

5    decided to afford controlling weight to the opinions of non-examining state agency consultants

6    who had opined that Plaintiff was "limited to light exertion with occasional postural limitations

7    along with only non-severe mental impairments." *Id*.

8            In a similar fashion, the ALJ gave "little weight" to the opinions of Dr. Catlin as well as

9    the opinions of Plaintiff's treating psychiatrist, Dr. Seal (who the ALJ failed to mention while

10   instead naming Ms. Jennings-Parriott, the social worker who was a co-signatory to Dr. Seal's

11   report). *Id*. at 34. In a similarly self-defeating fashion, the ALJ noted that because they do not

12   identify limitations, GAF scores are "of limited use," however, the ALJ then relied on the mild to

13   moderate GAF score found in a 2013 assessment performed by the Santa Rita Jail as confirmation

14   that the opinions of Drs. Caitlin and Seal "are contrary to the evidence of record." *Id*. In fact, while

15   Defendant's statement is imbedded in a series of *post hoc* justifications for the ALJ's error, in this

16   court, "[t]he Commissioner notes that [t]he American Psychiatric Association abandoned the GAF

17   scale in the DSM-V because of, among other things, its conceptual lack of clarity (i.e., including

18   symptoms, suicide risk and disabilities in its descriptors) and questionable psychometrics in

19   routine practice." *See* Def.'s Mot. (dkt. 18) at 18. Thus, it should also not go without mention that

20   while the ALJ was busy myopically focusing on Plaintiff's GAF score from jail records, he

21   neglected to even mention Plaintiff's astoundingly low IQ score. *See AR* at 27-36. By failing to

22   even mention Plaintiff's RBANS and WAIS-IV IQ scores, and by relying instead on a 2013 GAF

23   score to discredit the opinions of examining physicians, "the evidence cited by the ALJ in support

24   of his assertion significantly mischaracterizes the record, [because] the ALJ ignored evidence

25   pointing to a contrary conclusion." *Ramirez v. Berryhill*, 739 F. App'x 428, 431 (9th Cir. 2018)

26   (citing *Diedrich v. Berryhill*, 874 F.3d 634, 643 (9th Cir. 2017) (holding that an ALJ errs by

27   ignoring competent evidence that contradicts the ALJ's findings); *Rose v. Shalala*, 34 F.3d 13, 18

28   (1st Cir. 1994) (ALJ may not ignore medical evidence or substitute his own views for a medical

United States District Court
Northern District of California

United States District Court
Northern District of California

1   opinion); *see also Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998); *Rohan v. Chater*, 98 F.3d

2   966, 970 (7th Cir. 1996).

3          Other than when test results were rejected by implication because the ALJ failed to even

4   mention or discuss the evidence, the ALJ's only explanation for rejecting the opinions of Drs.

5   Catlin and Seal was identical to the explanation for rejecting Dr. Huen's opinions, that is, because

6   of the assertion that they were inconsistent with the record, when they were not, and because they

7   were "contrary" to the opinions of the non-examining state agency consultants. *AR* at 34.

8   Additionally, the ALJ also premised rejecting the opinions of the only two mental health

9   professionals to have actually examined Plaintiff on the faulty foundation that, at times during his

10  medical history, Plaintiff has appeared to persons untrained in the mental health professions as

11  having a relatively normal mental status. *Id*. Thus, by relying on notations of "normal" mental

12  status descriptions on intake forms meant to admit Plaintiff for physical treatment in order to reject

13  the detailed and well-founded opinions of his treating psychiatrist and an examining psychologist,

14  the ALJ failed to accord due respect to specialists about medical issues related to their areas of

15  specialization. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical

16  opinion of a specialist about medical issues related to his or her area of specialty than to the

17  medical opinion of a source who is not a specialist."); *Revels v. Berryhill*, 874 F.3d 648, 654 (9th

18  Cir. 2017); *see also Benecke v. Barnhart*, 379 F.3d 587, 594 n.4 (9th Cir. 2004) (A doctor's

19  specialized knowledge is especially relevant with respect to conditions that are "poorly

20  understood" within the rest of the medical community.). In any event, the only other statement in

21  the ALJ's decision that ventured to explain the rejection of the opinions of Drs. Seal and Catlin

22  was when the ALJ mused that "[i]f the claimant had such marked and extreme mental

23  impairments, they would have been readily apparent to treating physicians and reported in the

24  mental status records, and they were not." *AR* at 31. However, this is no explanation at all because

25  it is quite well established that in the context of adjudicating an application for social security

26  benefits, an ALJ's "[s]heer disbelief is no substitute for substantial evidence." *Benecke*, 379 F.3d

27  at 594.

28          Having set forth the ALJ's explanations for the weighing of the evidence, it should now be

noted that medical opinions are "distinguished by three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The medical opinion of a claimant's treating provider is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); *see also Revels*, 874 F.3d at 654. In cases where a treating doctor's opinion is not controlling, the opinion is weighted according to factors such as the nature and extent of the treatment relationship, as well as the consistency of the opinion with the record. 20 C.F.R. § 404.1527(c)(2)-(6); *Revels*, 874 F.3d at 654.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (alteration in original) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quoting *Bayliss*, 427 F.3d at 1216); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his [or her] interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Further, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831; *see also Revels*, 874 F.3d at 654-55; *Widmark v. Barnhart*, 454 F.3d 1063, 1066-67 n.2 (9th Cir. 2006); *Morgan v. Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999); *see also Erickson v. Shalala*, 9 F.3d 813, 818 n.7 (9th Cir. 1993). In situations where a Plaintiff's condition progressively deteriorates, the most recent

1    medical report is the most probative. *See Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986).

2        It will not be necessary to determine whether or not the later-rendered findings and

3    opinions of Plaintiff's treating and examining physicians were "contradicted" by the earlier-

4    rendered opinions of the non-examining state agency consultants (Drs. Bilik, Samplay, Econome,

5    and Pancho) because the ALJ's explanations for rejecting this evidence did not even rise to the

6    standard of specific and legitimate reasons supported by substantial evidence for the reasons

7    discussed above. It was error for the ALJ to give controlling weight to the opinions of the non-

8    examining consultants (*see AR* at 31-33), and to exclusively base the Step Three analysis and the

9    RFC findings on those opinions because they are contradicted by the overwhelming weight of the

10   medical evidence as discussed above. Further, as mentioned above, those opinions "cannot by

11   [themselves] constitute substantial evidence that justifies the rejection of the opinion of either an

12   examining physician or a treating physician." *Lester*, 81 F.3d at 831. Beyond that, the ALJ's

13   decision to reject the opinions of Drs. Catlin and Seal rested on the faulty reasoning described

14   above as well as a near-complete misapprehension of the record. Accordingly, the court now finds

15   that the opinions of Dr. Huen, Dr. Seal, and Dr. Catlin are due to be credited-as-true as a matter of

16   law.

17   **Nature of Remand**

18       The decision whether to remand for further proceedings or for payment of benefits

19   generally turns on the likely utility of further proceedings. *Carmickle v. Comm'r, SSA*, 533 F.3d

20   1155, 1169 (9th Cir. 2008). A district court may "direct an award of benefits where the record has

21   been fully developed and where further administrative proceedings would serve no useful

22   purpose." *Smolen*, 80 F.3d at 1292.

23       The Court of Appeals for the Ninth Circuit has established a three-part test "for

24   determining when evidence should be credited and an immediate award of benefits directed."

25   *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Remand for an immediate award of

26   benefits is appropriate when: (1) the ALJ has failed to provide legally sufficient reasons for

27   rejecting such evidence; (2) there are no outstanding issues that must be resolved before a

28   determination of disability can be made; and, (3) it is clear from the record that the ALJ would be

United States District Court
Northern District of California

19

1   required to find the claimant disabled were such evidence credited. *Id*. The second and third

2   prongs of the test often merge into a single question; that is, whether the ALJ would have to award

3   benefits if the case were remanded for further proceedings. *Id*. at 1178 n.2; *see also Garrison v.*

4   *Colvin*, 759 F.3d 995, 1021-23 (9th Cir. 2014) (when all three conditions of the credit-as-true rule

5   are satisfied, and a careful review of the record discloses no reason to seriously doubt that a

6   claimant is, in fact, disabled, a remand for a calculation and award of benefits is required).

7          Here, in light of the above-discussed and improperly discredited medical opinion evidence

8   two things are clear: first, it is clear that Plaintiff has in fact been disabled since his alleged onset

9   date, and second, it is clear that further administrative proceedings would be useless because the

10  ALJ would be required to find Plaintiff disabled on remand. First, even putting aside the entire

11  universe of Plaintiff's many physical impairments and their consequential limitations, Plaintiff's

12  bipolar disorder, depression, PTSD, and intellectual disability would undoubtedly compel a

13  disability finding at Step Three because they each clearly meet the criteria for the the four relevant

14  listings, to wit, Listing 12.04(A)(1) (depressive disorder), Listing 12.04(A)(2) (bipolar disorder),

15  Listing 12.15 (trauma-related disorders), and Listing 12.05 (intellectual disorder)). *See* 20 C.F.R.

16  Pt. 404, Subpt. P, app. 1, §§ 12.04, 12.05, 12.15. Because the ALJ erroneously found that <u>all</u> of

17  Plaintiff's mental impairments and most of his physical impairments were non-severe at Step

18  Two, the ALJ only considered Listing 1.04 (disorders of the spine) at Step Three. *See AR* at 30-32.

19         In any case, the first reason that further administrative proceedings would be useless is that

20  based on the improperly discredited evidence, Plaintiff's condition clearly meets the criteria of

21  Listing 12.04(A)(1) pertaining to depressive disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1,

22  §12.04. To satisfy the criteria of Listing 12.04 – it is necessary to satisfy the pertinent criteria

23  listed in subparts (A)(1) and (B), or (A)(1) and (C). *See id*. Subpart (A) requires medical

24  documentation of a depressive disorder, characterized by five or more of the following: depressed

25  mood; diminished interest in almost all activities; appetite disturbance with change in weight;

26  sleep disturbance; observable psychomotor agitation or retardation; decreased energy; feelings of

27  guilt or worthlessness; difficulty concentrating or thinking; or thoughts of death or suicide. §

28  12.04(A). Drs. Seal and Catlin found that Plaintiff met eight of these criteria, basically every

United States District Court
Northern District of California

20

1    category with the exception of psychomotor agitation or retardation. *See AR* at 588, 590, 593-95,

2    683, 1072, 1074, 1076-79). Turning to Subpart (B) of Listing 12.04, that provision requires:

3    extreme limitation of one, or marked limitation of two, of the following areas of mental

4    functioning: understanding, remembering, or applying information; interacting with others;

5    concentrating, persisting, or maintaining pace; adapting or managing oneself. § 12.04(B). Drs.

6    Seal and Catlin found marked limitations in all four of these categories. *See AR* at 595-96, 684-85,

7    1079-80. Thus, Plaintiff's depression has clearly been disabling under Listing 12.04(A)(1) and (B)

8    since his alleged onset date.

9          The second reason that further administrative proceedings would be useless is that

10   Plaintiff's bipolar disorder also clearly meets the criteria of Listing 12.04(A)(2). To satisfy the

11   criteria for bipolar disorder in Listing 12.04 – it is necessary to satisfy the pertinent criteria listed

12   in subparts (A)(2) and (B), or (A)(2) and (C). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04. The

13   first part of listing level bipolar disorder is characterized by three or more of the following:

14   pressured speech, flight of ideas, inflated self-esteem, decreased need for sleep, distractibility,

15   involvement in activities that a high probability of painful consequences that are not recognized,

16   or increased goal-directed activity or psychomotor agitation. *Id*. at §12.04(A)(2). Once again, Drs.

17   Seal and Catlin both found that Plaintiff met the same three criteria: a decreased need for sleep,

18   distractibility, and involvement in activities that have a high probability of unrecognized painful

19   consequences. *See AR* at 588, 590, 593-95, 683, 1073-74, 1076-79. Subpart (B) has the same

20   requirements and criteria discussed above; and, as was the case above, Drs. Seal and Catlin found

21   marked limitations in all four categories. *See id*. at 595-96, 684-85, 1079-80. Accordingly,

22   Plaintiff's bipolar disorder has also been clearly disabling under Listing 12.04(A)(2) and (B) since

23   his alleged onset date.

24         The third reason that further administrative proceedings would serve no purpose is that

25   Plaintiff's PTSD also clearly meets the criteria of Listing 12.15. As was the case above, in order to

26   satisfy the criteria for listing-level PTSD under §12.15 – it is necessary to satisfy the pertinent

27   criteria listed in subparts (A) and (B), or (A) and (C). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1,

28   §12.15. The first part of Listing 12.15(A) requires meeting all of the following criteria: exposure

United States District Court
Northern District of California

21

United States District Court
Northern District of California

1    to actual or threatened death, serious injury, or violence; subsequent involuntary re-experiencing

2    of the traumatic event (e.g., intrusive memories, flashbacks, or dreams); avoidance of external

3    reminders of the event; disturbances in mood and behavior; and, increases in arousal and reactivity

4    (e.g., exaggerated startle response or sleep disturbance). *Id.* Once again, Drs. Seal and Catlin both

5    found that Plaintiff met all of these criteria as a result of the trauma he experienced due to the

6    untimely death of his mother. *See AR* at 588-90, 593-95, 683-84, 1072, 1074, 1076-79. Subpart

7    (B) has the same requirements and criteria discussed above; and, again, Drs. Seal and Catlin found

8    marked limitations in all four categories. *See id.* at 595-96, 684-85, 1079-80. Accordingly,

9    Plaintiff's PTSD has also been clearly disabling under Listing 12.15(A) and (B) since his alleged

10   onset date.

11       The fourth reason that further administrative proceedings would be a waste of time is that

12   Plaintiff's intellectual disorder also clearly meets the criteria set forth in Listing 12.05(B). In order

13   to satisfy the criteria for listing-level intellectual disorder under §12.05 – it is necessary to satisfy

14   the pertinent criteria listed in either subpart (A) or (B). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1,

15   §12.05. The criteria set forth in Subpart (B) require a full scale IQ score of 70 or below; significant

16   deficits in adaptive functioning currently manifested by extreme limitation of one, or marked

17   limitation of two of the following areas of mental functioning: understanding, remembering, or

18   applying information; interacting with others; concentrating, persisting, or maintaining pace; and

19   adapting or managing oneself – additionally, the evidence about the current level of intellectual

20   and adaptive functioning should demonstrate or support the conclusion that the disorder began

21   prior to the age of 22. *See id.* at §12.05(B)(1)-(3). In this regard, in March of 2017, Dr. Catlin's

22   administering of the WAIS-IV resulted in a full scale IQ score of 67 (*see AR* at 1085-89); and, as

23   mentioned above, Drs. Seal and Catlin found marked limitations in all four of the areas of mental

24   functioning. *See id.* at 595-96, 684-85, 1079-80. As to evidence of the onset of the disorder prior

25   to the age of 22, Dr. Catlin explained that because of the symptoms of his intellectual disorder,

26   Plaintiff has never been able to live independently, has only managed to undertake very limited

27   employment, has been unsuccessful in school throughout his formative years, always needing

28   special education services, and has always struggled to manage his mental health symptoms. *Id.* at

1    588-89, 590-93, 594-96, 1072, 1077-80. Thus, Plaintiff's intellectual disorder has also been

2    clearly disabling under Listing 12.05(B) since his alleged onset date.

3          As for the fifth reason that the record conclusively establishes that Plaintiff has been

4    disabled since his alleged onset date, even if one were able to overlook the fact that his mental

5    impairments clearly meet the above-described listings, the combination of his physical and mental

6    impairments would also compel a disability finding during the formulation of the RFC. Given the

7    fact that the improperly rejected evidence established marked or extreme limitations in all of the

8    areas of mental functioning, combined with the physical limitations opined by Dr. Huen ("[w]ork

9    capacity right now, I would say at this point is less than sedentary given his inability to sit very

10   long due to lumbar spine pain . . . [and] [l]ifting and carrying are pretty much ruled out . . . " *see*

11   *AR* at 584), lead to the inescapable conclusion that Plaintiff has had no residual capacity to

12   function in the workplace at all since his alleged onset date. Turning to the sixth and final reason

13   that Plaintiff must be found disabled since his alleged onset date on remand – when the improperly

14   rejected evidence is given effect, the ALJ would be required to find Plaintiff disabled at Step Five

15   based on the VE's testimony. As mentioned above, at the hearing before the ALJ, the VE testified

16   that if someone were off-task even 10% of the time, or if one were to consistently arrive late to

17   work or leave early by as little as an hour, or consistently be absent for one or more days per

18   month – that such a person would not be employable. *See id*. at 68-70. In this regard, Dr. Seal

19   opined that Plaintiff's conditions would see to it that he would be off-task for more than 30% of a

20   typical workday, as well as being absent from work more than 4 days per month. *Id*. at 685.

21   Likewise, Dr. Catlin opined that Plaintiff's impairments would cause him to be absent form work

22   more than 4 days per month. *Id*. at 596, 1080. Thus, Plaintiff would also be found disabled since

23   his alleged onset date at Step Five based on the testimony of the VE.

24         At this juncture, the court will note that in cases where each of the credit-as-true factors is

25   met, it is generally only in "rare instances" where a review of the record as a whole gives rise to a

26   "serious doubt as to whether the claimant is actually disabled." *Revels*, 874 F.3d at 668 n.8 (citing

27   *Garrison*, 759 F.3d at 1021). This is not one of those "rare instances," as the record leaves no

28   room to doubt that Plaintiff has in fact been disabled since his alleged onset date. Defendant,

United States District Court
Northern District of California

1    however, makes a series of contrary contentions to the effect that "[t]he record in this case shows

2    that there are significant conflicts in the evidence [such as the fact that] Plaintiff admitted to being

3    able to lift up to 20 pounds and reported to doctors that he walked and occasionally rode a

4    bicycle." *See* Def.'s Mot. (dkt. 18) at 23. For the reasons discussed above, the court finds this

5    argument to be wholly unpersuasive and sees no reason to occasion any further delays attending

6    the administrative process such as to needlessly work out the timeline, or veracity, of Plaintiff's

7    alleged statement about his alleged ability to, at some point in his life, lift 20 pounds or ride a

8    bicycle. Needlessly remanding a disability claim for further proceedings would only delay much

9    needed income for claimants such as Plaintiff who are unable to work and who are entitled to

10   benefits, which would in turn subject them to "tremendous financial difficulties while awaiting the

11   outcome of their appeals and proceedings on remand." *Varney v. Sec'y of Health & Human Servs.*,

12   859 F.2d 1396, 1398 (9th Cir. 1988). Thus, the law in this Circuit does not permit a case like this

13   to be remanded for no reason other than to allow an ALJ a nugatory opportunity to inquire into the

14   details of a statement about lifting 20 pounds or riding a bicycle, or, worse yet, to concoct a

15   different explanation for a non-disability finding that likewise would fall short of the legal

16   standards described herein. *See Benecke*, 379 F.3d at 595 ("Allowing the Commissioner to decide

17   the issue again would create an unfair 'heads we win; tails, let's play again' system of disability

18   benefits adjudication.").

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**CONCLUSION**

Accordingly, for the reasons stated above, Plaintiff's Motion for Summary Judgment (dkt. 14) is **GRANTED**, and Defendant's Motion for Summary Judgment (dkt. 18) is **DENIED**. The ALJ's finding of non-disability between the alleged onset date of July 1, 2001, and November 1, 2017, is **REVERSED** and the case **REMANDED** for the immediate calculation and payment of benefits pertaining to this period of time.

**IT IS SO ORDERED.**

Dated: July 21, 2020

ROBERT M. ILLMAN
United States Magistrate Judge